# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs March 8, 2011

## STATE OF TENNESSEE v. DAVID EARL OFFUTT

Appeal from the Davidson County Criminal Court
No. 2004-A-281     Cheryl A. Blackburn, Judge

### No. M2010-01296-CCA-R3-CD - Filed June 30, 2011

This case is before the court after remand to the Davidson County Criminal Court for sentencing after this court reinstated three convictions for attempted incest that the trial court incorrectly merged with three attempted rape convictions. On remand, the trial court sentenced the Defendant, David Earl Offutt, to serve four years for each of the Class D felony attempted incest convictions and ordered that the sentences be served consecutively to each other but concurrently with an effective eighteen-year sentence the Defendant was serving for other convictions. See T.C.A. §§ 39-12-101 (attempt), 39-15-302 (2010) (incest). On appeal, the Defendant contends that the trial court erred by imposing maximum sentences for his attempted incest convictions and ordering that they be served consecutively. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

James O. Martin, III (on appeal) and Charles Walker (at sentencing), Nashville, Tennessee, for the appellant, David Earl Offutt.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

The facts of the Defendant's convictions were described in the Defendant's previous appeal:

A Davidson County grand jury indicted the defendant for ten separate offenses involving acts committed against K.F.[1], his stepdaughter. Counts one and two of the indictment charge the defendant with aggravated sexual battery occurring when the victim was nine years old; the defendant was acquitted of these charges when the jury was unable to reach a verdict. Counts three through five of the indictment charge the defendant with separate acts of raping the victim in a Nashville hotel room on June 26, 2003, when the victim was fifteen years old. Counts six through eight of the indictment charge the defendant with incest relating to the same incident. The jury convicted the defendant of the lesser offenses of attempted rape and attempted incest, respectively, and the trial court merged the attempted incest counts into the attempted rape counts at sentencing. Counts nine and ten charge the defendant with separate acts of sexual battery by an authority figure occurring during the same incident. The jury convicted the defendant as charged in counts nine and ten.

K.F., who was seventeen years old at the time of trial, testified that she had lived in LaVergne, Tennessee for about eight years and was a senior at LaVergne High School. She stated that before moving to La Vergne, she lived in Antioch, Tennessee with her mother and stepfather, the defendant. She testified that during her sophomore year she attended Pearl-Cohn High School where the defendant taught and coached basketball. The victim played basketball while at Pearl-Cohn.

The victim recalled that her mother was pregnant with her baby brother, the defendant's son, while the family lived in Antioch. She related that when she was about nine years old,

---

[1]It is the policy of this court to refer to victims of sexual offenses by their initials.

2

the defendant woke her up while she was sleeping on the couch in the den. She stated that he initially acted like he was tickling her but then began to slowly rub her chest area outside her clothing; she testified that her breasts were "[a] little" developed at that age. She recalled that the defendant asked her how it felt and she moved his hand away as she rolled away from him. She said that her mother was in bed asleep when it happened. She said that the incident confused and scared her and that she did not tell her mother because "I just didn't know what to say."

The victim testified that at another time when she was watching television in the den, the defendant came into the room, sat on the couch and began rubbing her breasts and then placed his hand on her vagina inside her panties. She said that she began to move around to stop him and the defendant asked her, "are you okay or how does that make you feel?" She testified that she did not respond verbally but would just shake her head and try to move away from him. She said that her mother was the only other person in the house and that she was asleep in bed when this incident happened. She recalled that her brother had not yet been born. She also testified that the defendant told her not to tell her mother. She stated that these two incidents were the clearest in her mind but that the defendant touched her on other occasions.

When asked why she did not tell her mother, she stated that her mother was pregnant at the time and that she (the victim) did not "want all that to be in the way" after her brother was born. She testified that she did tell her mother about the abuse sometime in 2001 when she was twelve years old. She recalled that her mother confronted the defendant about the abuse and that he denied it. She stated that her mother asked the defendant to leave their home for some time, possibly a weekend, but that her mother asked him to return.

During June 2003, the victim attended a basketball camp at Tennessee State University. She recalled that the defendant would take her to the camp and pick her up in the afternoon. On Friday, the last day of the camp, the defendant picked her up and instead of going home, took her to a hotel near the airport. She

remembered going to a Ruby Tuesday restaurant next door to the hotel before he rented the room. Although she could not recall the name of the hotel, she remembered that a Corvette convention was going on at the hotel. She said that they checked into the room and the defendant rented a "dirty movie." She testified that the defendant suggested that he give her a massage and began rubbing her while she was fully clothed. The defendant removed her clothes. The defendant touched the victim's breast, vaginal area and her "butt." She testified that the defendant digitally penetrated her vagina. She said that the defendant was also naked. She testified that she never told him to stop but that she did not want him to do any of these things. She stated that he tried to penetrate her vagina with his penis "but he didn't" except to the point of penetrating the outer area of her vagina. She said that the defendant also "tried to anally penetrate [her]" and that it hurt when he tried to do that. She remembered that the defendant used some sort of lubricant like Vaseline. She recalled that she started to cry and the defendant stopped trying to penetrate her and sat on the edge of the bed massaging her instead. Regarding her demeanor, she said that she "was speechless . . . numb . . . [and] scared ." She testified that the sexual activity lasted "[a]t least an hour" and that "[i]t seemed like forever. But ... it was still light outside when [we] left."

The victim testified that, after leaving the hotel, she and the defendant went to Kmart and home. She did not tell her mother about the hotel incident but, within a month, the victim told C.E., her best friend. C.E. encouraged the victim to talk to an adult mentor at their church, Catherine Gallop. About two or three weeks after telling C.E., the victim confided in Ms. Gallop. On October 17, 2003, the victim was interviewed at school by Marlene Baugh, an investigator with the Department of Children's Services. The victim testified that she did not contact DCS or ask anyone to contact them on her behalf, but that it did not take her long to figure out why Ms. Baugh wanted to talk to her. Following her taped interview with Ms. Baugh, the victim submitted to a gynecological examination. Although the victim was unable to tell detectives or Ms. Baugh the name of the hotel where the incident took place, her memory of a

4

Corvette show and nearby businesses allowed investigators to determine where the incident occurred.

On cross-examination, the victim explained some discrepancies between her prior statements to Ms. Baugh and her testimony at trial. She acknowledged some discrepancies concerning the rooms in the home where the abuse occurred when she was nine years old but she explained that she told Ms. Baugh about more incidents than she testified to at trial and that these incidents occurred in rooms other than the den. She also admitted that she told Ms. Baugh that she left the hotel room and returned but explained that no one asked her about leaving on direct examination. She testified that she told Ms. Baugh that the defendant offered her money to take her clothes off, so she did and sat on his lap in the hotel room. She denied telling Ms. Baugh that she took a nap at the hotel room and stated that she did not remember that happening. She also admitted that the defendant never threatened her or harmed her physically. She also testified that she entered someone's home without permission in March 2003.

On redirect examination, the victim explained that she and the district attorney had discussed that there would be some areas of the incident about which she would not be questioned. Specifically, the district attorney had told her that he would not question her about the defendant offering her money in exchange for sexual acts and about leaving the hotel room and returning. She stated that she was testifying truthfully. She further said that she did leave the hotel room and thought about running away on the day of the incident because she anticipated that the defendant would ask her for sex. She also anticipated that the defendant would offer her money in exchange for sex. She recalled that there was a discussion about going to the hotel room on their way to lunch that day. She admitted that she did not say anything to the defendant about going to the hotel room, but she testified that she did not want to have sex with him. She explained that her statements differed because she would remember other instances as she was questioned by investigators and that she would not give all the details to her friends to whom she reported the abuse. She also testified that she felt like her

5

mother stopped listening to her once she allowed the defendant to move back into the home. She said that since the allegations came to light in 2003, her mother divorced the defendant and that she now has some peace and is feeling better about herself after feeling very ashamed of what the defendant had done to her.

Catherine Gallop testified that she knew the victim through church. She recalled that C.E. alerted her to the victim's report of abuse and Ms. Gallop approached the victim to see if she wanted to talk about it. She described the victim as "very quiet" with "a lot on her mind." Ms. Gallop recalled that the victim told her the abuse began when she was nine years old. She also remembered the victim describing her first report to her mother and the defendant leaving the home for some time. Ms. Gallop told the victim that she would talk to their pastor who might want her to talk to the victim's mother. She stated that the victim never asked her to involve DCS. She recalled that the victim "seemed embarrassed and sad, and she blamed herself" when recounting what had happened. On cross-examination, Ms. Gallop testified that she discussed the incident with the victim on another occasion and took notes after their pastor recommended that she do so. She consulted her sister, who is a social worker, for questions she should ask the victim in preparation for reporting the abuse to DCS. Ms. Gallop testified that she informed the victim of any action she was going to take throughout her discussions with the victim, but that the victim did not specifically ask her to contact authorities.

C.E. stated that the victim was her best friend and that they knew each other through church. She said that it was her idea for the victim to talk to Ms. Gallop. She recalled that the victim seemed "scared to tell." On cross-examination, she remembered that the victim told her about the abuse when C.E. was sleeping over at her house. She stated that she told the victim that she had been abused also. C.E. described the victim as a generally happy girl but that she was embarrassed by the incidents with the defendant. On redirect examination, C.E. testified that the victim told her that she would often try to avoid being in the defendant's presence and that she would lock

6

herself in her bedroom in order to protect herself from the defendant. C.E. testified that the victim also told her that the defendant would offer the victim money after he would "try to touch her or whatever."

Maureen Sanger, Ph.D., testified that she was employed as a psychologist for fifteen years at Our Kids' Center, a sexual abuse center associated with Nashville General Hospital. She stated that she conducted an initial interview of the victim on November 7, 2003. The victim reported that the defendant began abusing her at age nine. Dr. Sanger's account of the abuse was consistent with that testified to by the victim.

Holly Gallion testified that she is a pediatric nurse practitioner employed with Our Kids' Center. Ms. Gallion testified that the victim presented as a fully developed adult female, having completed all stages of puberty. Ms. Gallion testified that the victim's medical examination revealed no present or past trauma to her vaginal area. However, she explained that digital or attempted penile penetration would not necessarily produce trauma or tearing. Ms. Gallion also testified that the examination revealed no trauma to the victim's rectum, but she stated that was consistent with the victim's report that the defendant used Vaseline when he anally penetrated the victim. She testified that the center conducts approximately eight hundred examinations each year and that ninety-four to ninety-seven percent of the children have normal exams.

The victim's mother testified that she married the defendant in 1996 after dating a little over a year. The couple lived with the victim and their infant son in Davidson County until the family moved to LaVergne in May 1998[2]. She stated that the defendant was involved in the victim's school and athletic activities but that she was the disciplinarian. Regarding the victim's 2001 report to her, the victim's mother said that she confronted the defendant who explained that he accidentally

_____

[2]The victim's mother testified that the victim's birthday is June 7, 1988, and the victim's brother was born on April 20, 1997.

touched the victim between her legs as he removed the victim's hands from between her legs while he was attempting to awaken her from the couch; the defendant denied any other allegations and told her that he would not jeopardize his family or career. Nevertheless, the victim's mother stated that she believed the victim and told the defendant to leave; he returned about a week later because their son was crying for him to come home and the defendant was the family's only source of income.

The victim's mother recalled that she realized when the victim was twelve years old that she had begun locking her bedroom door. When she asked the victim why she was locking her door, the victim told her to keep her little brother out. Even after asking the victim not to lock her door, she continued to do so. The victim's mother testified that she never reported the 2001 allegations to the authorities because she was never sure it had happened, but that she decided that she "would keep [her] eye on [the situation] just in case."

The victim's mother testified that the victim was involved in several basketball camps in the summer of 2003 and that the defendant was responsible for transporting her to the camps. She testified that one camp was held at Tennessee State University in "the latter part of June." Although unable to recall specifically going to any hotels in the summer of 2003, the victim's mother testified that the family would sometimes go to the Holiday Inn at Hickory Hollow; she stated that they never went to the Hampton Inn and Suites near the airport.

The victim's mother stated that since the victim spoke to authorities at school on October 17, 2003, the defendant never returned to the family home. She spoke with the defendant on his cellular telephone who insisted that the victim "was lying on him" and he had not done anything. The victim's mother told him "to come and get his stuff and get out." She confronted him with his promise not to touch her again made after the 2001 allegations, and the defendant again denied ever touching the victim. She stated that the defendant told her he was sorry for what the family was going through.

8

After the investigators told her the details of the victim's 2003 allegation, the victim's mother looked for documentation to confirm whether the defendant had stayed at a hotel contemporaneous to the basketball camp. The victim's mother testified that at the time of the allegations, the defendant was driving a green Plymouth Grand Caravan vehicle. She discovered a bank statement from her husband's debit card account containing a debit for Ruby Tuesday's Restaurant and the Hampton Inn and Suites on June 27, 2003. She also discovered statements with an address listed for Auburn, Kentucky but testified that the defendant had family in Kentucky but had not lived there since she had known him. She was unaware of the Hampton Inn and Ruby Tuesday charges but upon reading the statement, the victim's mother immediately realized the significance of them and turned over the bank statement to the police. The victim's mother testified that she knew of no legitimate reason for the defendant to take her daughter to the Hampton Inn and Suites on that date.

On cross-examination, the victim's mother denied ever thinking that the defendant had been to the hotel with another woman and stated that "I thought of my child because of that date." She testified that she filed for divorce in August 2004 and explained that she did not have the money to file sooner. The victim's mother denied continuing a relationship with the defendant after October 2003. On redirect examination, the victim's mother testified that she was unaware of any conflicts between the defendant and the victim and that she "truly" knew of no motive the victim would have to make up the accusations. She did recall telling the victim that she did not know who to believe because "[t]hat was at the point where I was still going back and forth"; but she stated that since seeing the receipts and listening to her daughter's report, she is now sure that her daughter is telling the truth.

Marlene Baugh testified that she was part of a special investigative unit with DCS in 2003. As part of a special unit, she was responsible for investigating child abuse and neglect allegations throughout Middle Tennessee that involved teachers, foster parents or "anyone whose livelihood could depend on

9

their interaction with children." When Ms. Baugh first interviewed the victim on October 17, 2003, she asked the victim if she knew why she was being interviewed and the victim told her that "she thought it was involving a situation with her father where he had been doing bad things to her." Ms. Baugh testified that based upon the victim's report of the 2003 incident, she and the investigators were able to ascertain the location and date of the offense. She recalled the victim told her that she left the hotel room briefly "because of the past experiences she had been through she understood at this point in time what was going to happen." The victim told Ms. Baugh that when she returned to the room, the defendant was naked and offered her money to take off her clothes and to "climb on top of his lap." Ms. Baugh acknowledged that the victim did not disclose any allegations of anal penetration during the first interview, but did report it for the medical examination. When she asked the victim why she did not initially report that, the victim told Ms. Baugh that she did not ask; Ms. Baugh testified that "in all cases" the detail of the information was directly conditioned upon the questions asked by the case worker. The victim also told Ms. Baugh that she had reported the abuse to her mother previously and that the defendant had moved out of the home for some time but returned after the defendant "said he was sorry for what he had done."

Brett Gipson testified that he was a detective with the Youth Services Division of the Metropolitan Police Department in October 2003 and that he investigated the victim's allegations[3]. He testified that based upon the victim's report, he confirmed the victim's participation in the basketball camp at TSU and that it ended on Friday, June 27. He also recalled receiving bank records from the victim's mother which indicated that the defendant had rented a room at the Hampton Inn and Suites near the airport and had eaten at a nearby Ruby Tuesday's Restaurant on June 27. Mr. Gipson testified that he interviewed the defendant and that the defendant denied all

---

[3]By the time of the trial, Mr. Gipson had become a licensed attorney.

10

allegations of abuse. The defendant told Mr. Gipson that he avoided normal fatherly affection with the victim because "he was afraid of allegations of sexual abuse or improper touching and that he wouldn't even hug children at school." When confronted with the allegation about the hotel, the defendant initially denied taking the victim to a hotel but then told investigators that the entire family had gone to the Holiday Inn at Hickory Hollow that week. The defendant also told Mr. Gipson that one of the victim's friends accompanied the family on the trip. However, Mr. Gipson testified that his investigation never revealed any documentation regarding a trip to the Holiday Inn and no witnesses were able to corroborate the defendant's statement. The defendant consistently denied the allegations and could not offer an explanation or motive for the victim to accuse him.

Celester Elliott, the General Manager of the Hampton Inn and Suites on Donelson Pike, testified that the defendant registered at the hotel on June 26, 2003, using an address of Auburn, Kentucky. The registration card showed that the defendant registered only himself, with no additional adults or children. The card also reflected a charge for the rental of an in-room adult movie. Mr. Elliott testified that the defendant registered his vehicle, a Green Plymouth Grand Voyager van. The card reflected that the defendant checked-in to the room at 2:31 p.m. and rented the movie at 2:54 p.m. The registration card also reflected a check-out time of 11:06 am the next day which Mr. Elliot explained could occur if the registrant had left the night before and left the key in the room.

Based upon this proof, the jury was unable to reach a verdict on counts one and two of the indictment related to the acts that were alleged to have occurred when the victim was nine years old; the trial court entered judgments of acquittal on these counts. Regarding the 2003 hotel room allegations, the jury convicted the defendant as follows: lesser included offenses of attempted vaginal rape, attempted anal rape and attempted digital rape in Counts Three, Four and Five; lesser included offenses of attempted incest in Counts Six, Seven, and

Eight; and two counts of sexual battery by an authority figure as charged in Counts Nine and Ten.

In the Defendant's first appeal, this court noted as a matter of plain error

> that the trial court should not have merged the attempted incest convictions into the convictions for attempted rape because each of these offenses are legally and factually distinct. State v. Brittman, 639 S.W.2d 652, 654 (Tenn. 1982); William Hackworth v. State, No. M2003-02148-CCA-R3-PC, [Davidson County] (Tenn. Crim. App. July 28, 2004) (incest is not a lesser included offense of rape; both convictions are appropriate). Therefore, upon remand, the convictions for attempted incest shall be reinstated and the trial court shall determine the appropriate sentence for each offense.

State v. David E. Offutt, No. M2007-02728-CCA-R3-CD, Davidson County (Tenn. Crim. App. Aug. 20, 2009), app. denied (Tenn. Mar. 1, 2010).

On remand, the trial court held a hearing, at which both parties declined to offer evidence. In imposing maximum, four-year sentences, the trial court referred to the evidence presented at the first sentencing hearing. The trial court relied on Tennessee Code Annotated section 49-15-115(b)(5) (2010), permitting consecutive sentencing for two or more offenses involving sexual abuse of a minor, in ordering that the three attempted incest convictions be served consecutively. This appeal followed.

Before we may address the merits of the Defendant's appeal of the sentence imposed, we must first address the State's contention that the Defendant has waived appellate review by failing to include in the record of this appeal a transcript of the testimony and any other proof offered at the first sentencing hearing. Although the transcript and exhibits from that first sentencing hearing were not made part of the record in the present case, they are part of the appellate record in the Defendant's first appeal. We elect to take judicial notice of the record of the earlier proceedings in this case and to consider this appeal on its merits. See Delbridge v. State, 742 S.W.2d 266, 267 (Tenn. 1987).

Before the first sentencing hearing, the Defendant signed a waiver of his right to be sentenced under the law that existed at the time of the offenses and chose to be sentenced under the amended sentencing law that took effect on June 7, 2005. At the hearing, the proof included a presentence report, which reflected that the fifty-three-year-old Defendant had a

master's degree in education and was employed as a high school teacher before he was incarcerated. He received an honorable discharge after serving in the Air Force for approximately two years. The report stated that the Defendant had no prior criminal history, although he had pending charges in Rutherford County for sexual battery by an authority figure. See State v. David Offutt, No. M2008-00687-CCA-R3-CD, Rutherford County (Tenn. Crim. App. Apr. 30, 2009) (appeal from the Rutherford County Circuit Court's denial of the Defendant's motion to set aside his guilty pleas to three counts of incest).

At the first sentencing hearing, the eighteen-year-old victim testified that the Defendant engaged in sexual activity with her on occasions other than those charged in the indictment. She agreed the Defendant was indicted in Rutherford County for additional sexual misconduct toward her. She said the Defendant's abuse took place over a period of several years. She said the Defendant exposed her to pornography once or twice. She said that as a result of the Defendant's actions, she had low self-esteem and was ashamed. She said the Defendant was the primary male figure in her childhood. She said that she attended counseling once but that she did not want to continue because she was embarrassed. She said she had tried to cope with what happened by attending church more and increasing involvment in school activities.

On cross-examination, the victim testified that at one point, she told her mother about the Defendant's activities and that the Defendant left the home for "about a weekend." She said that after he returned to the home, it was about two months until he resumed sexually abusing her. She said the Defendant said, "[Y]ou won't tell," and asked whether she would report his behavior. She admitted he did not threaten her.

Brenda Thompson King testified that she was the principal of the high school where the Defendant had been employed as a special education teacher. She described the Defendant as a stable and good teacher. She said that she was confident in his abilities and that she depended on his help with special projects. She said the Defendant assisted her with disciplinary issues even if they did not involve his students. She said the Defendant had a good relationship with other staff and faculty members. She said he was a "mild mannered person" in the classroom. She noted that unlike many other male teachers, he decorated his classroom in an inviting manner. She said that she was "shocked" to learn of the allegations against the Defendant and that she never received any complaints about inappropriate behavior, even after the allegations arose. She said that the Defendant was polite to her when he gave her his resignation letter and that she was touched by the tenderness in the letter regarding his experiences at the school. She said that if the Defendant had been acquitted, she would have rehired him.

On cross-examination, Dr. King acknowledged that the school system would have to approve any rehiring of the Defendant had he been acquitted. She did not think the publicity surrounding the Defendant's crime cast the school in a negative light, but she thought his conduct reflected negatively on the teaching profession.

Henry Merriwether testified that he was the assistant principal at the school where the Defendant had worked. He said his experience with the Defendant mirrored the experience to which Dr. King testified. He said he supervised the Defendant in the Defendant's role as boys' assistant basketball coach. He said he thought the Defendant was a "pretty good" coach. He stated that he never heard any allegations of sexual misconduct by the Defendant either before or after the allegations arose in the present case. He said that the Defendant was a gentleman and that he concurred with Dr. King's testimony that she would rehire the Defendant.

On cross-examination, Mr. Merriwether acknowledged that his perception of the Defendant differed from the nature of the Defendant's convictions. He admitted he was unaware that the Defendant took the victim to a hotel and sexually abused her.

Ricky Collins testified that he had known the Defendant for almost forty years and that they had been friends since childhood. He said he never heard of the Defendant behaving inappropriately. He said the Defendant loved his family and attended church. He said that he and the Defendant worked together at Pearl-Cohn High School and that they coached the girls' freshman basketball team. He described the Defendant as "a working man" who was like a second father to the children. He said the Defendant wanted the children to do well academically and in athletics. He said he never had any complaints about the Defendant from the students he taught. He said the Defendant was a good person who was reliable and did extra work, such as cleaning or repairing the gym.

On cross-examination, Mr. Collins acknowledged that it was difficult for him to be a witness in the case. He said he considered the Defendant to be honorable and truthful. He acknowledged that he was unaware of allegations of sexual abuse in the Defendant's home in 2000 or 2001 and that he was unaware the Defendant left the home for a period of time due to the allegations.

Mr. Collins testified that the Defendant was proud of the victim's academic performance and told others when she was listed on the honor roll. He said the Defendant "tried to instill good things" in the victim. He described the victim as "a good kid."

Beverly Hobbs testified that she was one of the Defendant's eight siblings and that the Defendant was four years younger. She said that they were from a close family and that they

remained close as adults.  She said the Defendant had always been a hard worker and had been employed since he was a teenager.  She agreed that the Defendant helped others and that he "gave back" to his church and the community.  She said the Defendant was their mother's primary caregiver from the time she became ill until her death in 2001.  She described the Defendant as responsible, a good person, and a good brother.

The Defendant stated the following in his allocution:  He was born in Kentucky and was one of nine siblings.  His family moved to Tennessee when he was an infant.  He attended Nashville area schools, played basketball in high school, and was Mr. Pearl High School. He played basketball at a state community college and at Tennessee State University (TSU).  He enlisted in the Air Force after graduating from TSU.  He described his employment history from 1971 through 2003. He said that he received a master's degree in education in administration supervision and that he had an additional forty-five college credits.  He said he did not commit the crimes of which he was convicted.

After receiving the proof, the trial court noted that neither party filed a notice of mitigating or enhancement factors upon which they intended to rely.  The court also observed that the Defendant exercised his right not to participate in a psychosexual evaluation and stated that it would not consider that fact in sentencing the Defendant.  The trial court stated that in sentencing the Defendant for the attempted incest convictions, it relied on the findings it made when sentencing the Defendant for the attempted rape convictions at the first sentencing hearing.  After the second sentencing hearing, the trial court filed a sentencing order in which it referred to and relied on its findings of the enhancement factors from the first sentencing hearing.

At the first sentencing hearing, the trial court found that the Defendant had no prior convictions but found that enhancement factor (1) applied based upon the Defendant's prior history of criminal behavior.  The court noted the victim's testimony of "multiple acts over years" in addition to the offenses of which the Defendant was convicted.

With regard to enhancement factor (7), the trial court found at the first hearing that the Defendant's offenses were committed to gratify his desire for pleasure or excitement. The court noted that the Defendant ordered a pornographic movie at the hotel where he sexually abused the victim, that he suggested that the victim give him a massage, that he used lubricant to commit the offenses, and that he gave the victim money after the offenses.

With regard to enhancement factor (14), the trial court found at the first hearing that the Defendant abused a position of public or private trust.  The court noted that the Defendant was the victim's stepfather and that he exploited his role in providing her transportation to and from her basketball activities in order to assault her sexually.

In imposing consecutive sentences at the second hearing, the trial court relied on Tennessee Code Annotated section 40-35-115(a)(5), that the Defendant committed two or more offenses involving sexual abuse of a minor, taking into consideration the aggravating circumstances from the relationship; the time period of the Defendant's undetected sexual abuse; the nature and scope of the offenses; and the residual, physical, and mental damage to the victim. The trial court noted, "This was a stepfather. This went on for sometime, and it was a particularly horrendous situation under the circumstances." The trial court also adopted its findings from the first sentencing hearing as support for its order of consecutive sentencing for the attempted incest convictions. At the first hearing, the trial court's findings included:

> [Consecutive sentencing factor] number five is clearly made out by the proof in this case . . . . All of these aggravating circumstances were present in this case. There was an extensive period of time that they went undetected. Though there was a time when they were disclosed to [the victim's] mother, her mother didn't tell anybody, and the defendant came back to the house and continued on. There was obviously residual or minimal [sic] damage. [The victim] has chosen not to participate in counseling. She still has testified to the damage that was done to her.

On appeal, the Defendant contends that the trial court erred in relying on its findings from the first sentencing hearing and argues that he should not have received maximum, consecutive sentences. The State contends that the Defendant has not shown that the trial court erred. We agree with the State.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d

335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2010).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2010); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210. From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Carter, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)).

The determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of

discretion.  State v. Blouvet, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997).  Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b) (2010), which states in pertinent part that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damages to the victim or victims.

The Defendant contends that the trial court erroneously applied the "law of the case" doctrine and relied on its findings from the previous sentencing hearing, rather than making findings for the offenses that were under consideration at the second sentencing hearing.  In State v. Jefferson, 31 S.W.3d 558 (Tenn. 2000), our supreme court addressed the "law of the case" doctrine, explaining,

> The phrase "law of the case" refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case.  In other words, under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal.  The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication.  The doctrine does not apply to dicta.

> The law of the case doctrine is not a constitutional mandate nor a limitation on the power of a court.  Rather, it is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited.  This rule promotes the finality and efficiency of the judicial process, avoids indefinite relitigation of the same issue, fosters consistent results in the same litigation, and assures the obedience of lower courts to the decisions of appellate courts.

18

Therefore, when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand. There are limited circumstances which may justify reconsideration of an issue which was [an] issue decided in a prior appeal: (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

31 S.W.3d at 560-61 (quoting Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd., 975 S.W.2d 303, 306 (Tenn. 1998)) (emphasis added).

The record reflects that in referring to its factual findings from the first sentencing hearing, the trial court referred to the "law of the case." Despite the reference, the record reflects that the parties were given the opportunity to present additional proof relative to sentencing for the attempted incest convictions, but none was presented at the second hearing. Thus, the proof before the trial court with respect to enhancement and mitigating factors and considerations for consecutive sentencing remained the same. Even though the court sentenced the Defendant for different offenses at the second hearing, they arose from the same course of criminal conduct as the offenses for which the Defendant was sentenced at the first hearing and which were the subject of the trial. Given that the evidence was the same at both hearings, we hold that the trial court did not err in adopting and relying upon its factual findings from the previous sentencing hearing in sentencing the Defendant for the attempted incest offenses.

We next consider whether the Defendant has shown that the sentences imposed were excessive. The Defendant does not contend that the enhancement factors found by the trial court or the statutory basis for consecutive sentencing did not apply as a matter of law. He relies solely on his argument, rejected above, that the court erred in applying the enhancement factors and basis for consecutive sentencing based upon its findings from the previous hearing. Upon review of the record, we conclude that the trial court followed the statutory procedures in arriving at the sentences. The record reflects that the trial court was swayed to impose maximum sentences for the offenses based upon the Defendant's significant record of prior criminal activity, the Defendant's desire for sexual gratification or excitement, and the Defendant's manipulation of his role as the victim's stepparent to

19

accomplish the offenses. We conclude that the Defendant has failed to show that the lengths of his sentences are inappropriate.

We also conclude that the record supports the trial court's imposition of consecutive sentences based upon Tennessee Code Annotated section 40-35-115(a)(5). As the trial court noted, the Defendant's conduct consisted of two or more sexual offenses against a minor. There were numerous uncharged offenses spanning a period of several years. Even after the victim reported the conduct to her mother and the Defendant left the home, the Defendant returned and resumed the sexual abuse. The Defendant exploited his role as the victim's stepfather to satisfy his own desires. The trial court accredited the victim's testimony about her difficulties due to the Defendant's conduct. The trial court did not err in ordering that the three attempted incest convictions be served consecutively.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE